Joseph R. Saveri (State Bar No. 130064)
Jiamin Chen (*pro hac vice* to be submitted)
Nicomedes Sy Herrera (State Bar No. 275332)
V Prentice (State Bar No. 309807)
Demetrius X. Lambrinos (State Bar No. 246027)
James Dallal (State Bar No. 277826)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email:       jsaveri@saverilawfirm.com
             jchen@saverilawfirm.com
             nherrera@saverilawfirm.com
             vprentice@saverilawfirm.com
             dlambrinos@saverilawfirm.com
             jdallal@saverilawfirm.com

*Counsel for Five Rivers Electronic Innovations LLC*

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIVE RIVERS ELECTRONIC INNOVATIONS LLC, on behalf of itself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KEMET CORPORATION; KEMET ELECTRONICS CORPORATION; MURATA ELECTRONICS NORTH AMERICA, INC.; MURATA MANUFACTURING CO., LTD.; NEC CORPORATION; OKAYA ELECTRIC AMERICA INC.; OKAYA ELECTRIC INDUSTRIES CO., LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; PANASONIC ELECTRONIC DEVICES CO. LTD; PANASONIC INDUSTRIAL DEVICES SALES COMPANY OF AMERICA; SANYO ELECTRIC CO., LTD.; SANYO NORTH AMERICA CORPORATION; SUMIDA AMERICA COMPONENTS, INC.; SUMIDA CORPORATION; SUMIDA ELECTRIC CO., LTD.; TAIYO YUDEN CO., LTD.; TAIYO YUDEN (U.S.A.) INC.; TDK CORPORATION; TDK-EPC CORPORATION; TDK U.S.A. CORPORATION; TOKIN CORPORATION; TOKIN AMERICA, INC.; TOKO INC.; and JAPAN ELECTRONICS AND INFORMATION TECHNOLOGY INDUSTRIES ASSOCIATION<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................................1

II.   JURISDICTION AND VENUE ......................................................................... 3

III.   PARTIES ........................................................................................................... 4

    A.   Plaintiff Five Rivers Electronic Innovations ......................................... 4

    B.   Murata and TOKO Defendants .............................................................. 4

    C.   Okaya Defendants .................................................................................. 5

    D.   Panasonic and SANYO Defendants ...................................................... 5

    E.   Sumida Defendants ................................................................................ 7

    F.   Taiyo Yuden Defendants........................................................................ 8

    G.   TDK Defendants .................................................................................... 9

    H.   TOKIN Defendants ..............................................................................10

    I.   Defendant Japan Electronics and Information Technology Industries
       Association ............................................................................................11

IV.   CLASS ALLEGATIONS ..................................................................................12

V.   TRADE AND COMMERCE.............................................................................14

VI.   ALLEGATIONS OF FACT ..............................................................................16

    A.   Passive Components ..............................................................................16

        i.   Capacitors ..................................................................................17

        ii.   Inductors ....................................................................................17

    B.   Inductor Market Conditions ..................................................................19

    C.   Factual Allegations as to Defendants' Collusive Conduct .................... 22

        i.   Defendants Maintained and Operated a Collusive Business
            Environment ............................................................................... 22

        ii.   Defendants Exchanged Competitively Sensitive Information and
            Attempted to Conceal Their Collusion .................................... 23

        iii.   Additional Indications of Defendants' Collusion ..................... 25

VII.   FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING........................ 26

VIII.   CLAIM FOR RELIEF ..................................................................................... 27

IX.   DEMAND FOR JUDGMENT ......................................................................... 28

Plaintiff Five Rivers Electronic Innovations, LLC brings this action on behalf of itself and others similarly situated for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, against Defendants Murata Manufacturing Co., Ltd., Murata Electronics North America, Inc., TOKO, Inc., Okaya Electric Industries Co., Ltd., Okaya Electric America Inc., Panasonic Corporation, Panasonic Electronic Devices Co. Ltd., Panasonic Corporation of North America, Panasonic Industrial Devices Sales Company of America, SANYO Electric Co., Ltd., SANYO North America Corporation, Sumida Corporation, Sumida Electric Co. Ltd., Sumida America Components Inc., Taiyo Yuden Co., Ltd., Taiyo Yuden (USA) Inc., TDK Corporation, TDK-EPC Corporation, TDK U.S.A. Corporation, KEMET Corporation, KEMET Electronics Corp., TOKIN Corporation, TOKIN America, Inc., NEC Corporation, and Japan Electronics and Information Technology Industries Association. Based on investigation of its counsel, Plaintiff alleges on information and belief as follows:

I.    NATURE OF THE ACTION

1.    This action arises from a scheme between and among Defendants to fix, raise, stabilize, and maintain the price of electronic inductors ("Inductors") at supra-competitive levels since at least January 2002 to the present ("Class Period").

2.    Inductors, like capacitors, are passive electronic components that store energy. Whereas Inductors store energy in the form of a magnetic field, capacitors store energy in the form of an electric field. Because both Inductors and capacitors act as the fundamental parts of an electrical circuit, they are ubiquitous in electronic devices that rely on electronic circuits for power. In fact, virtually all electronic devices in common use today rely on electrical circuits, and thus the fundamental components of circuits, to perform their functions.

3.    Passive components, including Inductors, are widely needed to meet the ever-increasing dependence on technology and are inexpensive, interchangeable commodities. Inductors generally cost between 2 cents and 20 cents per unit.

4.    Participants in the Inductors market face business risks because this market is susceptible to fluctuations in demand for the products—such as televisions, wireless phones, computer screens, consumer audio and visual imaging, industrial supplies, defense equipment, and automobiles—that use Inductors as inputs.

5.      Further, multiple factors make passive components such as Inductors and capacitors especially susceptible to price fixing and other cartel behavior. These factors include rising input costs, declining demand in certain sectors, falling profit margins, high barriers to entry, price-inelastic demand, minimal bargaining power on the part of buyers, and high market concentration where a small number of manufacturers, namely Defendants, effectively control the Inductors supplier market.

6.      Defendants operated and maintained a collusive business environment in which Defendant companies, who are ostensibly competitors, collaborated and shared information on Inductors manufacturing, development, pricing, and sales, and directly or indirectly held shares of each other's companies to maintain and solidify their corporate relationships.

7.      Defendant companies are Japanese corporate entities that supply nearly all of the global Inductors market.

8.      Defendant companies also are all capacitors manufacturers.

9.      The United States Department of Justice Antitrust Division ("DOJ Antitrust") is prosecuting an ongoing criminal case against Japanese capacitor manufacturers in this district. Eight criminal defendants so far, including Defendant NEC TOKIN, have pleaded guilty to criminal violations of Section 1 of the Sherman Act for their participation in the capacitors price-fixing conspiracy. In addition, Defendant Panasonic Corporation applied for leniency for early cooperation with the Antitrust Division's Corporate Leniency Program with regard to the capacitors price-fixing conspiracy.

10.      A related consolidated class action litigation in this district seeks to hold capacitors manufacturers civilly liable for their participation in the capacitors price-fixing conspiracy. Defendants Okaya Electric Industries Co., Ltd., Okaya Electric America Inc., Panasonic Corporation, Panasonic Electronic Devices Co. Ltd., Panasonic Corporation of North America, SANYO Electric Co., Ltd., SANYO North America Corporation, KEMET Corporation, KEMET Electronics Corp., TOKIN Corporation, TOKIN America, Inc., and NEC Corporation are all named defendants in the capacitors price-fixing class action litigation.

11.      Because passive electronic components are closely related, and Defendant companies all manufacture capacitors as well as Inductors, many of the same employees of Defendants who exercised managerial responsibility over capacitors and participated in the capacitors price-fixing conspiracy also

exercised managerial responsibility over Inductors, and colluded as to Inductors using the same instrumentalities and devices as they did with respect to capacitors. These individuals with management responsibility over Inductors include at least one individual who was criminally indicted for the central role he played in the capacitors price-fixing conspiracy.

12.     As part of the anticompetitive scheme, Defendant companies exchanged competitively sensitive information as to Inductors and formed and reached anticompetitive agreements as to Inductors in similar ways, at the same or similar meetings and social events and through the same or similar communications where they exchanged similar competitively sensitive information and formed and reached similar anticompetitive agreements as to capacitors. The agreements and understandings reached by Defendants included agreements and understandings to resist or prevent Inductors price decreases and to raise, fix, and stabilize Inductors prices at supra-competitive levels.

13.     These collusive meetings and exchanges of information include meetings organized by or through, and under the auspices of, Defendant Japan Electronics and Information Technology Industries Association.

14.      On January 4, 2018, independent media publication MLex reported that the San Francisco branch office of the Department of Justice Antitrust Division served subpoenas on electronics manufacturers in November 2017 as part of a grand jury investigation into price-fixing in the Inductors market. MLex also reported that the Inductors subpoenas are part of the Antitrust Division's long-running investigation into the passive components industry.

15.     Plaintiffs, direct purchasers of Inductors, bring this action to recover their antitrust overcharges and obtain other appropriate relief on behalf of similarly situated purchasers.

## II.    JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337(a).

17.     Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected

interstate trade and commerce was carried out in this District, and one or more of the Defendants resides in this District, is licensed to do business in this District, or transacts business in this District.

18.     This Court has jurisdiction over Defendants because the wrongdoing alleged herein was directed at purchasers of Inductors in the United States and in this District.

## III.    PARTIES

### A.    Plaintiff Five Rivers Electronic Innovations

19.     Plaintiff Five Rivers Electronic Innovations, LLC ("Five Rivers") is a Tennessee limited liability company with its principal place of business located at 1285 East Andrew Johnson Highway, Greeneville, Tennessee 37745. Five Rivers directly purchased Inductors from one or more Defendants during the Class Period and has suffered injury as a result of Defendants' anticompetitive and unlawful conduct. Five Rivers is also a member of the proposed Direct Purchaser Class in the *In re Capacitors Antitrust Litigation*, No. 17-md-2801 (N.D. Cal.), litigation.

### B.    Murata and TOKO Defendants

20.     Defendant Murata Manufacturing Co., Ltd. ("Murata Ltd.") is a Japanese corporation with its principal place of business located at 10-1, Higashikotari 1-chome, Nagaokakyo-shi, Kyoto 617-8555, Japan. During the Class Period, Murata Ltd. manufactured, sold, and distributed Inductors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

21.     Defendant Murata Electronics North America, Inc. ("Murata NA"), a Texas corporation, is a wholly owned subsidiary of Murata Ltd. Murata NA's principal place of business is located at 2200 Lake Park Drive SE, Smyrna, Georgia, 30080. During the Class Period, Murata NA— either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Murata Ltd.

22.     Defendant TOKO, Inc. ("TOKO") is a Japanese corporation with its principal place of business located at 18, Gomigaya, Tsurugashima-shi, Saitama, 350-2281, Japan. In or about May 2016, TOKO became a wholly owned subsidiary of Murata Ltd., which previously had acquired a controlling interest in TOKO in March 2014. Prior to the 2014 acquisition, Murata Ltd. and TOKO executed a Capital and Business Alliance Agreement in or about March 2012 to cooperate in areas such as

expanding sales of power Inductors and developing next-generation Inductors. During the Class Period, TOKO—either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by its business units, subsidiaries, agents, or affiliates, or those of its corporate parent, Murata Ltd.

23.     TOKO, Murata NA, and Murata Ltd. are together referred to herein as "Murata."

24.     In 2014, the Murata Defendants had approximately $400 million in global Inductor sales, which accounted for about 16% of the global market share. A significant portion of Murata's sales of Inductors during the Class Period were made to customers in the United States. In 2007, for example, TOKO's sales of Inductors in North America amounted to $47 million.

**C.     Okaya Defendants**

25.     Defendant Okaya Electric Industries Co., Ltd. ("Okaya Co.") is a Japanese corporation with its principal place of business located at 16-9, Todoroki 6 chome, Setagaya-ku, Tokyo 158-8543, Japan. During the Class Period, Okaya Co. manufactured, sold, and distributed Inductors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

26.     Defendant Okaya Electric America Inc. ("Okaya America"), an Indiana corporation, is a wholly owned subsidiary of Okaya Co. with its principal place of business located at 52 Marks Road, Suite 1, Valparaiso, Indiana, 46383. During the Class Period, Okaya America—either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Okaya Co.

27.     Okaya Co. and Okaya America are together referred to herein as "Okaya."

**D.     Panasonic and SANYO Defendants**

28.     Defendant Panasonic Corporation is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Until October 1, 2008, Panasonic Corporation operated under the name of Matsushita Electric Industrial Co., Ltd. ("Matsushita"). During the Class Period, Panasonic Corporation and Matsushita (together, "Panasonic Corp.") manufactured, sold, and distributed Inductors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

29.     Defendant Panasonic Electronic Devices Co. Ltd ("PED"), a Japanese corporation, was a wholly owned subsidiary of Panasonic Corp until it was dissolved and absorbed into Panasonic Corp. in or about April 2012. PED was headquartered at 1006, Oaza Kadoma, Kadoma City, Osaka, Japan. Prior to its absorption into Panasonic Corp. and during the part of the Class Period, PED—either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by its business units, subsidiaries, agents, or affiliates, or those of its corporate parent, Panasonic Corp.

30.     Defendant Panasonic Corporation of North America ("Panasonic NA"), a wholly owned subsidiary of Panasonic Corp., is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102. During the Class Period, Panasonic NA—either directly or through its business units, subsidiaries, agents, or affiliates (including, without limitation, Panasonic Industrial Sales Company), or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Panasonic Corp.

31.     Defendant Panasonic Industrial Devices Sales Company of America ("PIDS"), a Delaware corporation, is a wholly owned subsidiary of Panasonic NA with its principal place of business located at Two Riverfront Plaza, Newark, NJ 07102. During the Class Period, PIDS—either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by its business units, subsidiaries, agents, or affiliates, or those of its corporate parent, Panasonic NA.

32.     Defendants Panasonic Corp., PED, Panasonic NA, and PIDS are together referred to herein as "Panasonic."

33.     Defendant SANYO Electric Co., Ltd. ("SANYO Co."), is a Japanese corporation and, as of December 2009, a wholly owned subsidiary of Panasonic Corp. SANYO Co.'s principal place of business is located at 15-5, Keihan-Hondori, 2-Chome, Moriguchi City, Osaka 570-8677, Japan. During the Class Period, SANYO Co. manufactured, sold, and distributed Inductors, either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers, or those of its corporate

parent. Prior to its acquisition by Panasonic Corp., SANYO Co. had no formal corporate affiliation with Panasonic Corp. or its business units, subsidiaries, agents, or affiliates.

34. Defendant SANYO North America Corporation ("SANYO NA"), a Delaware corporation, is a wholly owned subsidiary of SANYO Co. SANYO NA's principal place of business is located at 2055 Sanyo Avenue, San Diego, California 92154. During the Class Period, SANYO NA— either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, SANYO Co.

35. Defendants SANYO Co. and SANYO NA are together referred to herein as "SANYO," and, together with Panasonic, the entities are referred to herein as "Panasonic/SANYO."

36. In 2014, the Panasonic/SANYO Defendants had approximately $55 million in global Inductor sales. A significant portion of Panasonic/SANYO's sales of Inductors during the Class Period were made to customers in the United States. In 2007, for example, Panasonic sold at least $10 million of Inductors in North America.

**E.    Sumida Defendants**

37. Defendant Sumida Corporation ("Sumida Corp.") is a Japanese corporation with its principal place of business located at 1-8-10 Harumi, Chuo-Ku, Tokyo, 104-8547, Japan. During the Class Period, Sumida Ltd. manufactured, sold, and distributed Inductors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

38. Defendant Sumida Electric Co. Ltd. ("Sumida Electric") is a Japanese corporation and wholly owned subsidiary of Sumida Corp. with its principal place of business located at 3-6, 3-Chome, Ningyo-cho, Nihonbashi, Chuo-ku, Tokyo 103-8589, Japan. During the Class Period, Sumida Ltd. manufactured, sold, and distributed Inductors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

39. Defendant Sumida America Components Inc. ("Sumida America"), a wholly owned subsidiary of Sumida Electric, is a Delaware corporation with its principal place of business located at 1251 N Plum Grove Road, Suite 150, Schaumburg, Illinois, 60173. Sumida America also has offices in this District, at 1885 Lundy Avenue, Suite 250, San Jose, California 95131. During the Class Period,

Sumida America—either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent.

40.     Sumida Corp., Sumida Electric, and Sumida America are together referred to herein as "Sumida."

41.     In 2014, the Sumida Defendants had approximately $250 million in global Inductor sales, which accounted for about 10% of the global market share. A significant share of Sumida's sales of Inductors during the Class Period were made to customers in the United States. In 2007, for example, Sumida sold $27 million of Inductors in North America.

**F.     Taiyo Yuden Defendants**

42.     Defendant Taiyo Yuden Co., Ltd. ("Taiyo Yuden Ltd.") is a Japanese corporation with its principal place of business located at 6-16-20, Ueno, Taito-ku, Tokyo 110-0005, Japan. During the Class Period, Taiyo Yuden Co., Ltd., manufactured, sold, and distributed Inductors either directly or through its subsidiaries, agents, or affiliates to customers throughout the United States.

43.     Defendant Taiyo Yuden (USA) Inc. ("Taiyo Yuden USA"), an Illinois corporation, is a wholly owned subsidiary of Taiyo Yuden Ltd. with its principal place of business located at 10 North Martingale Road, Suite 575, Schaumburg, Illinois 60173. During the Class Period, Taiyo Yuden USA—either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Taiyo Yuden Ltd.

44.     Defendants Taiyo Yuden Ltd. and Taiyo Yuden USA are collectively referred to herein as "Taiyo Yuden."

45.     In 2014, the Taiyo Yuden Defendants had approximately $344 million in global Inductor sales, which accounted for about 14% of the global market share. A significant portion of Taiyo Yuden's sales of Inductors during the Class Period were made to customers in the United States. In 2007, for example, the Taiyo Yuden Defendants sold at least $16 million of Inductors in North America.

46.     In or about November 2014, Taiyo Yuden Ltd. entered into a capital and business alliance with ELNA Co., Ltd., a Japanese corporation specializing in the manufacture of passive

electronics, including capacitors and printed-circuit boards. In or about December 2015, Taiyo Yuden Ltd. became the largest shareholder of ELNA Co., Ltd.

### G.    TDK Defendants

47.    Defendant TDK Corporation ("TDK Corp.") is a Japanese corporation with its principal place of business at 13-1 Nihonbashi 1-chrome, Chuo-ku 103-8272, Tokyo, Japan. During the Class Period, TDK Corp. manufactured, sold, and distributed Inductors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

48.    Defendant TDK-EPC Corporation ("TDK-EPC"), a Japanese corporation, is a wholly owned subsidiary of TDK Corp. with its principal place of business located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023, Japan. TDK-EPC was founded in or about October 2009 from the combination of the passive components businesses of TDK Corp. and non-party EPCOS AG, a German corporation. During the Class Period, TDK-EPC—either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corp.

49.    Defendant TDK U.S.A. Corporation ("TDK USA"), a New York corporation, is a wholly owned subsidiary of TDK Corp. TDK USA has its principal place of business located at 525 RXR Plaza, Uniondale, New York, 11556. During the Class Period, TDK USA—either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corp.

50.    TDK Corp., TDK-EPC, and TDK USA are together referred to herein as "TDK."

51.    In 2014, the TDK Defendants had approximately $612 million in global Inductor sales, which accounted for about 24% of the global market share. A significant portion of TDK's sales of Inductors during the Class Period were made to customers in the United States. In 2007, for example, TDK's sales of Inductors in North America amounted to $57 million.

**H.    TOKIN Defendants**

52.    Defendant KEMET Corporation ("KEMET Corp.") is a Delaware corporation with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. During the Class Period, KEMET Corp. manufactured, sold, and distributed Inductors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

53.    Defendant KEMET Electronics Corp. ("KEMET Electronics"), a Delaware corporation, is a wholly owned subsidiary of KEMET Corp. with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. During the Class Period, KEMET Electronics—either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by its business units, subsidiaries, agents, or affiliates, or those of its corporate parent, KEMET Corp.

54.    KEMET Corp. is the holding company of KEMET Electronics and, accordingly, has no business of its own. KEMET Electronics is the alter ego of KEMET Corp. Although separate corporate entities, KEMET Corp. and KEMET Electronics are functionally a single economic and operational entity.

55.    KEMET Corp. and KEMET Electronics are managed by a single set of officers. The following individuals, for example, concurrently hold or held the same executive positions with both KEMET Corp. and KEMET Electronics: Mr. Per-Olof Loof (CEO and Director), Mr. William M. Lowe (Executive Vice President and Chief Financial Officer), Mr. R. James Assaf (Senior Vice President, General Counsel and Secretary), Ms. Susan B. Barkal (Senior Vice President and Chief of Staff), Mr. John Powers (Senior Vice President, Global Supply Chain & Chief Procurement), and Ms. Monica Highfill (Vice President Sales – Americas). KEMET Corp. did not recognize the corporate distinction between KEMET Corp. and KEMET Electronics and frequently used those corporate names interchangeably to refer to the signatory of particular agreements, often simply referring to the company as "KEMET."

56.    KEMET Corp. and KEMET Electronics are together referred to herein as "KEMET."

57.    Defendant TOKIN Corporation, an entity formerly and at all times during the Class Period known as NEC TOKIN Corporation ("NEC TOKIN Corp."), is currently a wholly owned

Japanese subsidiary of Defendant KEMET Electronics. TOKIN Corp. has its principal place of business located at 7-1, Kohriyama 6-chome, Taihaku-ku, Sendai-shi, Miyagi 982-8510, Japan. In fiscal year 2013, Defendant KEMET Electronics acquired a 34% interest in NEC TOKIN Corp. In 2017, KEMET Electronics completed its 100% acquisition of NEC TOKIN Corp. During the Class Period, NEC TOKIN Corp. manufactured, sold, and distributed Inductors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

58.     Defendant TOKIN America, Inc., an entity formerly and at all times during the Class Period known as NEC TOKIN America, Inc. ("NEC TOKIN America"), is a California corporation and wholly owned subsidiary of TOKIN Corp. with its principal place of business located at 2460 North First Street, Suite 220, San Jose, California 95131. During the Class Period, NEC TOKIN America— either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, NEC TOKIN Corp.

59.     TOKIN Corp. and TOKIN America are together referred to herein as "NEC TOKIN," and together with KEMET, the entities are referred to herein as "KEMET/TOKIN."

60.     In 2014, the NEC TOKIN Defendants had approximately $100 million in global Inductor sales.

61.     Defendant NEC Corporation ("NEC Corp.") is a Japanese corporation with its principal place of business located at 7-1, Shiba 5-chome Minato-ku, Tokyo 108-8001. Plaintiff seeks recovery from NEC Corp. to the extent that any liabilities for NEC TOKIN's Class Period activities remain with Defendant NEC Corporation.

**I.      Defendant Japan Electronics and Information Technology Industries Association**

62.     Defendant Japan Electronics and Information Technology Industries Association ("JEITA") is a trade association with its principal place of business located at Ote Center Bldg., 1-1-3, Otemachi, Chiyoda-ku, Tokyo 100-0004, Japan.

63.     During the Class Period, all other Defendants or their parent corporations, subsidiaries, agents, or affiliates were members of JEITA and used the machinery and instrumentalities of the association to engage in collusive conduct in violation of U.S. antitrust laws. JEITA's managers,

directors, and officers participated in the collusive conduct or failed to implement and maintain adequate safeguards to prevent the JEITA organization from being used for such illicit coordination between its members.

## IV.    CLASS ALLEGATIONS

64.    Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of a similarly situated Direct Purchaser Class, which is defined as follows:[1]

> All persons or entities in the United States that purchased Inductors (including through controlled subsidiaries, agents, affiliates or joint-ventures) directly from any of the Defendants, their subsidiaries, agents, affiliates or joint ventures from January 1, 2002 through the present (the "Class Period").

65.    The Direct Purchaser Class definition encompasses those who purchased Inductors directly from any of the Defendants, even if the Inductors purchased were manufactured, sold or distributed by a Defendant's predecessors, parents, business units, subsidiaries, affiliated entities, principals, agents, or co-conspirators.

66.    This definition of the Direct Purchaser Class specifically excludes the following persons or entities:

a.    Any of the Defendants named herein;

b.    Any of the Defendants' co-conspirators;

c.    Any of Defendants' parent companies and their subsidiaries, agents or affiliates;

d.    Any of Defendants' officers, directors, management, employees, subsidiaries, agents or affiliates;

e.    All governmental entities; and

f.    The judges and chambers staff in this case, as well as any members of their immediate families.

---

[1] Plaintiff's investigation is ongoing and has indicated that Defendants' conspiracy may have began as early as 1999. Plaintiff may seek to amend its allegations concerning the Class Period following further investigation and full discovery in this litigation.

67.     Plaintiff does not know the exact number of Direct Purchaser Class members because such information is in the exclusive control of Defendants. Upon information and belief, due to the nature of the trade and commerce involved, there are likely hundreds if not thousands of Direct Purchaser Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

68.     Plaintiff's claims are typical of the claims of the Direct Purchaser Class members because Plaintiff directly purchased Inductors from certain of the Defendants named herein. Therefore, Plaintiff and all Direct Purchaser Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

69.     Questions of law or fact common to the entire Direct Purchaser Class include but are not limited to the following:

    a.  Whether Defendants combined and/or conspired to fix, raise, maintain, or stabilize prices of Inductors sold to purchasers in the United States at any time during the Class Period;

    b.  Whether Defendants concertedly fixed, raised, maintained or stabilized prices of Inductors sold to purchasers in the United States at any time during the Class Period;

    c.  Whether Defendants committed other conduct, including but not limited to providing misleading and/or pretextual justifications for price increases,  in furtherance of the conspiracy alleged herein during the Class Period;

    d.  The duration and the extent of Defendants' conspiracy;

    e.  Whether Defendant fraudulently concealed their conspiracy from Capacitors purchasers in the United States;

    f.  Whether Defendants violated Section 1 of the Sherman Act;

    g.  Whether Defendants' conduct caused the prices of Inductors sold at any time during the Class Period to purchasers in the United States to be artificially fixed, raised, maintained or stabilized at noncompetitive prices;

h.   Whether Plaintiff and the other members of the Direct Purchaser Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages; and

i.   Whether Plaintiff and other members of the Direct Purchaser Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

70.   These and other questions of law and fact are common to the Direct Purchaser Class and predominate over any questions affecting the Class members individually.

71.   Plaintiff will fairly and adequately represent the interests of the Direct Purchaser Class because they directly purchased Inductors from one or more Defendants and it has no conflicts with any other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who demonstrate superior experience and capability in prosecuting antitrust class actions, including horizontal price-fixing conspiracies in particular, as well as other complex litigation.

72.   This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Class resolution reduces or eliminates the risks of repetitive litigation and of inconsistent or varying adjudications that establish incompatible standards of conduct for Defendants. Prosecuting this controversy on a classwide basis also furthers the interest of judicial economy. There will be no material difficulty in managing the prosecution of this suit as a class action.

## V.   TRADE AND COMMERCE

73.   During the Class Period, each Defendant, directly or through one or more of its respective parents, subsidiaries, business units, agents, or affiliates, sold or delivered Inductors to U.S. purchasers in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

74.   During the Class Period, Defendants purposefully directed conduct and activities at the United States and at Plaintiff, the members of the Direct Purchaser Class, and other U.S. purchasers. Such conduct and activities included, without limitation, manufacturing Inductors for sale or delivery to these and other U.S. purchasers, and selling, delivering, or otherwise transporting Inductors to these and other U.S. purchasers.

75.    Defendants, including but not limited to the following, assisted their respective corporate parent Defendants with the sale or delivery to U.S. purchasers of the parents' Inductors: Panasonic NA, SANYO NA, NEC TOKIN America, Taiyo Yuden USA, Okaya America, Murata NA, TDK USA, and Sumida America.

76.    During the Class Period, Defendants collectively controlled the market for the sale of Inductors, both globally and in the United States.

77.    Through the unlawful activities alleged herein, Defendants substantially and foreseeably affected commerce throughout the United States, causing injury to Plaintiffs and members of the Direct Purchaser Class. Defendants—directly and through their respective parents, subsidiaries, business units, agents, affiliates, successors, and predecessors—knowingly and intentionally engaged in a conspiracy to fix, raise, maintain and/or stabilize prices in the United States for Inductors. That conspiracy unreasonably restrained trade and artificially inflated the prices for Inductors and for manufactured products incorporating Inductors that were imported into the United States.

78.    Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable or intended anticompetitive effects upon interstate commerce within the United States.

79.    Specifically, Defendants marketed, sold, or distributed Inductors to be shipped or billed to customers in the United States. Such sales constitute domestic or import commerce. Defendants' anticompetitive conduct caused Plaintiff and members of the Direct Purchaser Class to pay supra-competitive prices for Inductors in the United States. Moreover, Defendants knew, including from sales and billing records, that they sold or distributed Inductors to U.S. purchasers.

80.    To the extent any sales of Defendants' Inductors to the Direct Purchaser Class do not constitute domestic or import commerce, the Defendants' unlawful activities with respect to those sales had a direct, substantial, and reasonably foreseeable effect on U.S. commerce that gives rise to the claims asserted herein. By causing the Direct Purchaser Class to pay supra-competitive prices on purchases shipped or billed to customers outside the United States (as well as those in the United States), Defendants' anticompetitive conduct had a direct and foreseeable impact on Class members' purchases in the United States.

81.     Further, Defendants also sold Inductors overseas directly to members of the Direct Purchaser Class (including through the Class members' controlled subsidiaries, agents, or affiliates), some of which were incorporated into products that Direct Purchaser Class members then imported into the United States. Defendants understood, including from customer negotiations and market research, that a significant portion of such overseas sales of Inductors to Direct Purchaser Class members would be incorporated into products sold in the United States or to U.S. customers. Defendants' anticompetitive conduct caused purchasers in the United States to pay supra-competitive prices for manufactured products that incorporated Inductors that Direct Purchaser Class members had purchased from Defendants. These overseas sales thus had a substantial, direct, and reasonably foreseeable effect on U.S. import commerce.

82.     Inductors sold overseas directly to members of the Direct Purchaser Class (including foreign subsidiaries and U.S. subsidiaries of foreign companies) that are imported into the United States similarly have a substantial, direct, and reasonably foreseeable effect on U.S. import commerce.

83.     The anticompetitive conduct described herein, and its substantial and foreseeable effect on U.S. commerce, proximately caused antitrust injury to Plaintiff and members of the Direct Purchaser Class. For each category of Defendants' anticompetitive sales, the resulting injuries to the Direct Purchaser Class amounted to hundreds of millions of dollars or more. As the natural and predictable consequences of Defendants' anticompetitive conduct, Defendants reasonably should have anticipated—or did, in fact, anticipate—these injuries to Plaintiff and the Direct Purchaser Class.

## VI.     ALLEGATIONS OF FACT

### A.     Passive Components

84.      Inductors, like capacitors, are a type of passive electronic component. Passive components, while simpler in nature than many other types of electronic components, are among the most fundamental building blocks of all types of electronic circuits. The distinguishing characteristic of passive components is that they do not require any form of electrical power to operate. Instead, the physical properties of the materials that compose a passive component cause it to perform the task for which it is employed. Generally, passive components either store or dissipate energy.

### i. Capacitors

85.    Capacitors store energy in an electrical field. In its basic form, a capacitor consists of two or more parallel conductive plates that are separated by insulating material. The insulating layer between a capacitor's plates is called the dielectric. The dielectric, a non-conductive material, restricts electrical current from flowing between the metal plates. As a result, an electrical charge builds up between these plates. This charge forms an electric field in which energy is stored.

86.    Capacitors block the flow of direct current (DC), but because of their ability to store energy in an electric field, allow alternating current (AC) to pass through. This stored energy similarly allows capacitors to pass high frequency signals while blocking lower frequencies. Because they can differentiate between DC and AC as well as higher frequency signals from lower ones, capacitors are widely used in electronic circuits to perform a variety of functions, such as smoothing the output of power supplies used to power electronic devices, tuning radios to particular frequencies, and filtering out unwanted noise that might impact sophisticated and highly-sensitive integrated circuits, such as chips or microchips.

### ii. Inductors

87.    While capacitors store energy in an electric field, Inductors store energy in a magnetic field. Inductors take their name from the principle of electromagnetic induction. Electrical current flowing through an Inductor forms a magnetic field. When the current rises, energy is stored in the magnetic field. When the current falls, the field releases energy. Because of the transfer of energy to and from their magnetic fields, Inductors effectively moderate fluctuations in the flow of electrical current.

88.    Inductors do not significantly limit the flow of electrical current, so direct current passes easily. Because Inductors impede changes in the flow of current, however, alternating current is blocked. Similarly, Inductors block high frequency signals while allowing lower frequency ones to pass. In other words, where capacitors block the flow of DC and allow AC to pass through, Inductors block the flow of AC and allow DC to flow through.

89.    The complementary nature of Inductors and capacitors supports their use in many of the same applications in electronic circuits, often in close conjunction.

90.    In its simplest form, an Inductor is a metal wire wrapped repeatedly around a core. For this reason, Inductors are commonly referred to as "coils." The material and shape of the core of an Inductor largely determine its performance characteristics. Inductors are therefore often classified by their core type (*e.g.*, air core Inductors, iron core Inductors, ferrite core Inductors, toroidal core Inductors, and laminated core Inductors).

91.    Inductors can also be classified by their construction (*e.g.,* molded Inductors, multilayer Inductors, coupled Inductors, *etc.*), their primary function (*e.g.,* power Inductors, RF Inductors, Chokes), their physical orientation (*e.g.,* surface mount Inductors, through-hole Inductors), or other defining characteristics. Other types of specialized Inductors include ferrite beads and EMI filters.

92.    The basic structure of an Inductor is illustrated below:



93.    The capacity of an Inductor, also known as inductance, is defined as the ratio of voltage to the rate of change of current (measured in units known as the henry).  Inductor capacity is controlled by four factors:

a.    *Number of Coils*: Increasing the number of coils results in higher inductance.

b.    *Core Material*: The material used to construct an Inductor's core can increase or decrease the component's inductance. Materials such as wood, glass, and plastic produce low levels of inductance, while substances such as iron, laminated iron, and powdered iron produce higher levels of inductance.

c.      *Coil Cross-Sectional Area*: Inductance increases as the cross-sectional area becomes larger. In general, donut-shaped cores provide more inductance than rod-shaped cores.

d.      *Coil Length*: As the length decreases, inductance increases.

**B.      Inductor Market Conditions**

94.      Global outlook sources indicate that, as of 2014, the global industry for passive electronic component commodities totaled $23.4 billion. Capacitors comprised about 78% of the overall industry, while Inductors and resistors each accounted for about 11% of total sales.

95.      The global demand for Inductors arises from the demand for the products that use Inductors as inputs (end-use segments).  Inductors are most commonly used in the production of televisions, wireless phones, computer screens, consumer audio and visual imaging, industrial supplies, defense equipment and automobiles.  By its nature, demand for Inductors is susceptible to economic downturns and cyclical fluctuations in consumer demand for end-use segment products. As illustrated below, demand for Inductors rose in 2008, fell in 2009, and remained relatively stable from 2010



through 2012.

96.      Multiple factors make Inductors, like other passive electronic components, susceptible to price fixing and other cartel behavior.

97.      Inductors are standardized, highly commoditized, interchangeable, low-cost components. Inductors from one manufacturer function the same way as Inductors with like

specifications and characteristics from another manufacturer. Manufacturers and passive component distributors maintain cross-reference tables so purchasers and product designers can identify equivalent Inductors. The fungibility of Inductors leads to low prices, because once a product becomes a commodity, market participants will compete principally on the basis of price rather than factors such as customer service or superior product quality. This downward pricing pressure diminishes the viability and appeal of entering the market for the production and sale of Inductors.

98.     In the present market, average prices of Inductors generally range between 2 cents and 20 cents per unit. And while global demand for Inductors has both risen and fallen in recent years—and is expected to rise in coming years (due in large part to pronounced increases in the demand for Inductors in automotive electronics and advanced consumer electronic devices)—the per unit selling price for Inductors has decreased in recent years:



99.     Further, industry analysts expect a number of challenges facing Inductor manufacturers, including rising costs of inputs, declining demand in some sectors, falling profit margins, and an increase in the number of manufacturers that also produce other passive electronic components, to continue in coming years and result in the continued decline of average per unit selling prices of Inductors globally (absent collusion and other anticompetitive conduct).

100.     Markets for passive components also present significant barriers to entry, and Inductors are no exception. High barriers, along with diminished incentives, inhibit the entry of new

manufacturers capable of competing with supra-competitive prices. Defendants, the major producers of Inductors, are well-established manufacturers of broad product portfolios who possess significant financial resources and installed capacity. Inductors must be built to exacting specifications, and their fabrication requires dedicated facilities that, without substantial investment, cannot be reassigned to manufacture other products. Defendants also benefit from established networks for securing raw materials, integration into their customers' existing supply chains, and strategic partnerships with many of their largest purchasers. Moreover, these requirements produce a high ratio of fixed costs to variable costs, which makes profitability depend more heavily on pricing.

101.    As a result, the market for Inductors is highly concentrated, with the top four producers accounting for more than half of Inductors sales since at least 2009.

102.    Increased market concentration facilitates price-fixing and other anticompetitive conduct by depriving purchasers of access to alternative, non-colluding suppliers and by simplifying the process of reaching and enforcing anticompetitive agreements. Defendants have effectively cornered the market for all Inductors. The limited number of manufacturers also eases the burdens of sharing information among them. Moreover, participation in industry associations—including Defendant JEITA, the Electronic Components Industry Association ("ECIA"), and the European Passive Components Industry Association ("EPCIA")—gives them a ready opportunity to do so.

103.    Defendants effectively wield the power resulting from high market concentration because of the inelastic demand, *i.e.*, demand fluctuates very little in response to changes in prices, in the Inductors market. Inductors purchasers generally cannot respond to higher prices by buying fewer Inductors because there are no practical substitutes for Inductors. Once a given circuit design calls for use of Inductors, electronics manufacturers must purchase the requisite Inductors. Inductors are also one of the lower-cost inputs in electronics products incorporating other more expensive, more sophisticated components. Thus, price inflation for such passive components may go undetected by purchasers for some time. Electronics manufacturers also often face strict product delivery deadlines and cannot risk missing deadlines for lack of a comparatively low-cost input. Similarly, electronics distributors must maintain the ability to deliver a wide range of products promptly and reliably, or they

risk losing business to competitors. These Inductors purchasers therefore have limited ability to reject prices, even where prices are unfavorable or higher than they should be.

104.    The sheer volume of Inductors purchasers also diminishes the relative power of each in price negotiations. Inductors manufacturers sell to three primary channels—original equipment manufacturers (OEMs), electronics manufacturing services (EMSs), and contract manufacturers (CMs)—each of which comprises a large number of purchasers. Inductors manufacturers therefore need not worry if their high prices lose an occasional sale.

**C.    Factual Allegations as to Defendants' Collusive Conduct**

**i.    Defendants Maintained and Operated a Collusive Business Environment**

105.     Capacitors and Inductors are closely related passive component commodities. Many companies that manufacture, sell, and distribute capacitors also manufacture, sell, and distribute Inductors.

106.    In fact, each and every named Defendant company or group of companies manufactures, sells, and distributes capacitors as well as Inductors.

107.    During the Class Period, capacitor manufacturer companies, including several named Defendants, engaged in a longstanding anticompetitive conspiracy to fix, raise, stabilize, and maintain the prices of capacitors in violation of Section 1 of the Sherman Act.

108.    Specifically, Panasonic Defendants, Sanyo Defendants, NEC TOKIN Defendants, Kemet Defendants, and Okaya Defendants ("Common Defendants") are or were named defendants in the corresponding price-fixing class action litigation, *In re Capacitors Antitrust Litigation*, No. 3:14-cv-03264-JD (N.D. Cal filed July 18, 2014).

109.     In addition, DOJ Antitrust is prosecuting an ongoing criminal case centered on the capacitors price-fixing conspiracy. So far, at least eight criminal antitrust defendants, including Common Defendant NEC TOKIN, have pleaded guilty or publicly agreed to plead guilty to felony violations of Section 1 of the Sherman Act for participating in the capacitors price-fixing conspiracy during the Class Period. *See, e.g., United States v. NEC TOKIN Corp.*, No. 4:15-cr-00426-JD (N.D. Cal. filed Sept. 2, 2015).

110.    DOJ Antitrust also indicted at least nine individual officers, managers, and employees,

including at least one manager of Common Defendant NEC TOKIN, for felony violations of Section 1 of the Sherman Act based on their participation in the capacitors price-fixing conspiracy. *United States v. Isawa et al.*, No. 4:15-cr-00163-JD (N.D. Cal. filed March 12, 2015).

111.    Because passive electronic components are closely related, and Defendant companies all manufacture capacitors as well as Inductors, many of the same employees of Common Defendants who exercised managerial responsibility over capacitors and participated in the capacitors price-fixing conspiracy also exercised managerial responsibility over Inductors. Upon information and belief, many of these managers colluded, exchanged competitively sensitive information, and fixed prices of Inductors similarly to capacitors.

112.    For example, Tomohide Date of Common Defendant NEC TOKIN, who was criminally indicted for the central role he played in the capacitors price-fixing conspiracy, also exercised managerial responsibility over Inductors at Common Defendant NEC TOKIN during the Class Period. *See United States v. Isawa et al.*, No. 4:15-cr-00163-JD at Dkt. No. 15 (indicting Mr. Date and other individuals for price-fixing in violation of Section 1 of the Sherman Act).  Specifically, Mr. Date served as General Manager of NEC TOKIN's EMC Division and exercised responsibility and oversight as to sales and marketing of Inductors at Common Defendant NEC TOKIN during the Class Period. *See* https://media.digikey.com/pdf/PCNs/Kemet/PCN-042214-PK.pdf.

### ii.    Defendants Exchanged Competitively Sensitive Information and Attempted to Conceal Their Collusion

113.    Upon information and belief, Defendants participated in periodic meetings, including pretextual industry association meetings, such as meetings organized by, through, or with Defendant JEITA, during the Class Period. At the meetings, Defendants collusively reported and exchanged competitively sensitive information with each other and other competitors in the Inductors industry, including but not limited to information about demand, sales volume, pricing trends, inventory, capacity, capacity utilization, past and future pricing, business plans, and negotiations with specific customers. At these meetings, Defendants also formed, reached, participated in, and enforced agreements to fix, raise, maintain, and stabilize the price of Inductors above competitive levels.

114.    In fact, by no later than July 2014, JEITA's leadership also had become aware that its

activities violated the antitrust laws. During that month, JEITA distributed a handout to its members, including Defendants, announcing an internal investigation into creating an antitrust compliance structure. In particular, the Electronic Components Working Group announced plans to investigate antitrust compliance issues arising from its activities.

115.    Defendants knew their collusive conduct and sharing of competitively sensitive information at these meetings were unlawful. Accordingly, upon information and belief, Defendants took efforts to conceal their collusion.

116.    In many instances, Defendants avoided creating, maintaining, or distributing official meeting minutes or records. Instead, Defendants used emails, summaries, and notes drafted by Defendants' employees who attended these meetings and circulated them only among select employees of Defendants who were responsible for their respective Defendant employers' anticompetitive conduct, often with the instruction to distribute such documents internally with the utmost sensitivity.

117.    In these communications, Defendants often attempted to conceal details of their collusive discussions and agreements by using coded language to identify the Defendant co-conspirators and their respective employees involved in collusive discussions.

118.    Defendants also attended various social events in addition to or in relation to these meetings during the Class Period. At these social events, Defendants created, maintained, and solidified their close and collusive relationships with each other. At these social events, Defendants exchanged competitively sensitive information with each other and other competitors in the Inductors industry, including but not limited to information about demand, pricing trends and targets, inventory, production capacity, capacity utilization, demand, and specific customers. At these social events, Defendants also formed, reached, participated in, and enforced agreements to fix, raise, maintain, and stabilize the price of Inductors above competitive levels.

119.    In addition to in-person meetings, Defendants also engaged in multilateral and bilateral communications with each other and other co-conspirators in relation to and in furtherance of the Inductors price-fixing conspiracy during the Class Period. During and through these communications, Defendants exchanged competitively sensitive information with each other and other competitors in the Inductors industry, including but not limited to information about demand, pricing trends and targets,

inventory, production capacity, capacity utilization, demand, and specific customers. During and through these communications, Defendants also formed, reached, participated in, and enforced agreements to fix, raise, maintain, and stabilize the price of Inductors above competitive levels.

120.    Upon information and belief, Defendants exchanged competitively sensitive information and formed and reached anticompetitive agreements about Inductors at the same or similar meetings and social events and during the same or similar collusive communications where they exchanged similar information and formed and reached similar anticompetitive agreements about capacitors. Among other things, Defendants reached understandings and agreements to resist or limit Inductors price decreases and to raise, fix, and stabilize Inductors prices at supra-competitive levels.

121.    Further, during the Class Period, Defendants provided purchasers and the public with pretextual excuses for pricing increases and decreases, output levels, and increases of production lead times. Defendants' pretextual justifications were intended to and did mislead purchasers about the real reasons for, among other things, long production lead times.

122.    For example, in a passive component market survey in September 2009, purchasers indicated skepticism as to manufacturers' proffered explanations and justifications for extending lead times, such as shortages of raw materials, and expressed concern on poor visibility. The purchasers indicated that, by extending lead times, manufacturers were in fact attempting to artificially raise prices of passive components.

### iii.    Additional Indications of Defendants' Collusion

123.    Upon information and belief, during the Class Period, Defendant companies, while ostensibly competitors, actually engaged in a pattern of acquiring and holding the shares of each other's companies and of other competitors, or cross-shareholding, in a practice known as "Kabushiki Mochiai." Thus, Defendants have a direct financial interest in ensuring the success and profitability of their competitors. Further, this practice of cross-shareholding represents more than shared financial interests between Defendants; rather, cross-shareholding is intended to, has, and does signify and solidify a strong relationship between corporations and significantly influences their business dealings.

124.    Upon information and belief, during the Class Period, Defendant companies, instead of competing against each other, formed business alliances, partnerships, and joint ventures with each

other, through which they shared manufacturing know-how, intellectual property, and collaborated on sales with each other and other competitors.

125.    For example, in November 2014, Defendant Taiyo Yuden Co., Ltd. entered into an alliance agreement with its competitor ELNA, under which they agreed to and did collaborate on the supply procurement, development, and manufacturing of passive component products they both sold, share technology and manufacturing know-how in their common passive component product segments, and collaborate on product sales of products they both sold.

126.    Also, in March 2012, Defendant Murata Ltd. and its then-competitor Defendant TOKO entered into a capital and business alliance under which they agreed to and did collaborate on the development, manufacture, and sale of Inductors and Inductor-related products.

127.    As another example, Defendant Taiyo Yuden stated that it holds certain stocks "for purposes other than net investment," specifically, to "maintain and strengthen transactional relationship[.]" For this stated purpose, Defendant Taiyo Yuden held about 105,000 shares, worth about ¥520 million, of Kyocera Corporation, which is the 70% majority owner of Defendant Taiyo Yuden's Inductors and capacitors competitor AVX Corporation. For this same stated purpose, Taiyo Yuden also held significant shares in its capacitors competitor Nichicon Corporation.

128.    In addition, Defendants have announced and confirmed their intent to collaborate and collude rather than compete with each other and other competitors, including on price competition.

129.    For example, Eiji Watanuki, President of Defendant Taiyo Yuden, stated to shareholders in the 2013 annual report that "we are transforming our business model to accommodate the formation of alliances with other companies. Looking ahead, we intend to proactively enter these markets characterized as being comparatively less susceptible to price competition."

## VII.    FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

130.    Plaintiff and members of the Direct Purchaser Class have not and could not have with reasonable diligence independently learned the pertinent facts constituting their claims for relief asserted herein.

131.    Further, Plaintiff and members of the Direct Purchaser Class have not and could not have with reasonable diligence independently learned of the existence of the conspiracy alleged herein

until the DOJ's investigation of the conspiracy was made public in January 2018.

132.    Defendants engaged in an unlawful conspiracy that was designed to conceal and did conceal the existence, nature, and details of the conspiracy from Plaintiff and members of the Direct Purchaser Class.

133.    Upon information and belief, Defendants did not create, maintain, or distribute official records of the cartel meetings they held and attended in furtherance of the conspiracy, so as to maintain the secrecy of the conspiratorial conduct and of the conspiracy itself.

134.    Upon information and belief, Defendants also gave pretextual justifications for price increases and the reductions in output for Inductors that occurred during the Class Period to conceal their conspiracy.

135.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and the Direct Purchaser Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## VIII.    CLAIM FOR RELIEF

**RESTRAINT OF TRADE**
**IN VIOLATION OF THE SHERMAN ACT § 1**
**15 U.S.C. § 1**
**(Alleged against All Defendants)**

136.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

137.    Beginning at least as early as January 1, 2002, the exact date being unknown to Plaintiffs and the Direct Purchaser Class and exclusively within the knowledge of Defendants, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of Inductors directly sold to United States purchasers.

138.    In particular, Defendants have combined and conspired to raise, fix, maintain, and stabilize the prices of Inductors sold to United States purchasers during the Class Period.

139.    Because of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices of Inductors sold to purchasers in the United States during the

Class Period were raised, fixed, maintained, and stabilized at artificially inflated levels.

140.     The combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

141.     To formulate, effectuate, and further the conspiracy, Defendants and their co-conspirators did those things they combined and conspired to do, including but not limited to the following:

      a.   Participating in meetings and conversations to discuss their Inductors and coordinating actions to restrain trade for these products;

      b.   Communicating in writing and orally to raise, fix, maintain, and stabilize prices for Inductors;

      c.   Agreeing to coordinate and manipulate the prices and available supply of Inductors directly sold to United States purchasers that deprived these purchasers of free and open price competition;

      d.   Issuing and signaling price announcements, price quotations and production lead times for Inductors in accordance with collusive and anticompetitive agreements between and among Defendants;

      e.   Selling Inductors to United States purchasers at noncompetitive and artificially raised or maintained prices collusively determined by Defendants; and

      f.   Providing pretextual justifications to purchasers and the public to explain any raises, maintenance, or stabilization of the prices for Defendants' Inductors.

142.     Defendants' anticompetitive and unlawful conduct is illegal *per se*.

143.     As a result of Defendants' anticompetitive and unlawful conduct, Plaintiff and members of the Direct Purchaser Class have been injured in their businesses and property in that they have paid more for the Inductors they purchased during the Class Period than they otherwise would have paid in the absence of Defendants' conduct.

## IX.   DEMAND FOR JUDGMENT

144.     **WHEREFORE,** Plaintiff and the Direct Purchaser Class request the Court enter judgment on their behalf by adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiff serving as a Direct Purchaser Class Representative, and with Plaintiff's counsel serving as the Direct Purchaser Class Counsel under Fed. R. Civ. P. 23(g);

B.    Defendants have combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiff and the Direct Purchaser Class have been injured in their business and property as a result of Defendants' violations;

C.    Plaintiff and the Direct Purchaser Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiff and the Direct Purchaser Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15;

D.    Plaintiff and the Direct Purchaser Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

E.    Plaintiff and the Direct Purchaser Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

i.    A judicial determination declaring the rights of Plaintiff and the Direct Purchaser Class, and the corresponding responsibilities of Defendants; and

ii.    Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements alleged herein;

F.    Defendants are jointly and severally responsible financially for the costs and expenses of a Court-approved notice program;

G.    Plaintiff and the Direct Purchaser Class recover their reasonable attorneys' fees and other costs associated with this suit as provided by law; and

H.    Plaintiff and the Direct Purchaser Class receive such other or further relief as may be just and proper.

# JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, on behalf of itself and of the Direct Purchaser Class, demand a trial by jury of all the claims asserted in this complaint so triable.


Dated: February 8, 2018                          Respectfully Submitted,

                                                 JOSEPH SAVERI LAW FIRM, INC.

                                                 By:      */s/ Joseph R. Saveri*
                                                          Joseph R. Saveri

                                                 Joseph R. Saveri (State Bar No. 130064)
                                                 Jiamin Chen (*pro hac vice* to be submitted)
                                                 Nicomedes Sy Herrera (State Bar No. 275332)
                                                 V Prentice (State Bar No. 309807)
                                                 Demetrius X. Lambrinos (State Bar No. 246027)
                                                 James Dallal (State Bar No. 277826)
                                                 JOSEPH SAVERI LAW FIRM, INC.
                                                 601 California Street, Suite 1000
                                                 San Francisco, California 94108
                                                 Telephone:  (415) 500-6800
                                                 Facsimile:  (415) 395-9940
                                                 Emails:      jsaveri@saverilawfirm.com
                                                              jchen@saverilawfirm.com
                                                              nherrera@saverilawfirm.com
                                                              vprentice@saverilawfirm.com
                                                              dlambrinos@saverilawfirm.com
                                                              jdallal@saverilawfirm.com


                                                 Eric L. Cramer (*pro hac vice* to be submitted)
                                                 BERGER & MONTAGUE, P.C.
                                                 1622 Locust Street
                                                 Philadelphia, PA 19103
                                                 Telephone: (215) 875-3000
                                                 Facsimile: (215) 875-4604
                                                 Email:  ecramer@bm.net


                                                 Vincent J. Esades (*pro hac vice* to be submitted)
                                                 HEINS MILLS & OLSON, P.L.C
                                                 310 Clifton Avenue
                                                 Minneapolis, MN 55403
                                                 Telephone: 612-338-4605
                                                 Facsimile: 612-338-4692
                                                 Email: vesades@heinsmills.com

Howard J. Sedran (*pro hac vice* to be submitted)
Austin B. Cohen (*pro hac vice* to be submitted)
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone:    (215) 592-1500
Facsimile:    (215) 592-4663
Email:        hsedran@lfsblaw.com
              acohen@lfsblaw.com


Roberta D. Liebenberg, (*pro hac vice* to be submitted)
Paul Costa (*pro hac vice* to be submitted)
FINE, KAPLAN AND BLACK R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Telephone:    (215) 567-6565
Facsimile:    (215) 568-5872
Email:        rliebenberg@finekaplan.com
              pcosta@finekaplan.com


Jason S. Hartley (State Bar No. 192514)
STUEVE SIEGEL HANSON LLP
550 West C Street, Suite 1750
San Diego, CA 92101
Tel: 619-400-5822
Fax: 619-400-5832
Email: hartley@stuevesiegel.com


Solomon B. Cera (State Bar No. 99467)
CERA LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone:    (415) 777-2230
Facsimile:    (415) 777-5189
Email:        scera@cerallp.com

C. Andrew Dirksen (State Bar No. 197378)
CERA LLP
800 Boylston St., 16th Floor
Boston, MA 02199
Telephone:    (857) 453-6555
Email:        cdirksen@cerallp.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94118
Telephone:     (415) 981-4800
Facsimile:      (415) 981-4846
Email:          dcg@girardgibbs.com
                    je@girardgibbs.com

*Counsel for Five Rivers Electronic Innovations LLC*

**CLASS ACTION COMPLAINT**